## ROLAND *v.* ROLAND *et al.;* and *vice versa.*

1. Where a consent decree provided that a tract of land in dispute should belong to the defendant if he should pay to the plaintiff a specified sum by a date named, that if he should fail to do so the land should belong to the plaintiff, and that time was of the essence of the decree, equity would not relieve the defendant, or one who claimed to have purchased from him after the rendition of the decree, from the result of a failure to make the payment or a tender within the time limited, unless fraud preventing it, or some other sufficient ground of equitable relief, were shown.

2. Where such a consent decree provided for the making of payment to the plaintiff by name, and was signed both by the clients and their attorneys; and where it was agreed and understood by them all, outside of the face of the decree, that such payment had to be made to the plaintiff in person and not to the attorneys who had represented such plaintiff; and where, if such attorneys would otherwise have had an implied power to receive the money, it was revoked, a tender to one of them would not answer in lieu of tender or payment to the plaintiff in person.

3. Where the decree did not in terms provide for making payment to the attorneys of the plaintiff, but to such plaintiff by name, and the question of the right to make payment or tender to such attorneys depended on their general or implied powers, evidence was admissible to prove that it was agreed and understood by both clients and attorneys that the payment should be made to the plaintiff personally and not to the attorneys, and that any authority of the latter to receive it was revoked with their consent. Such evidence was not objectionable on the ground that it contradicted the decree.

4. If, after the rendition of such a decree, a third person purchased the land from the defendant, he took subject to the conditions of the decree; and if he was informed of the want of authority to receive the money on the part of the attorneys who had represented the plaintiff, in ample time to have made a payment or tender to the plaintiff personally, but, instead of so doing, merely caused the money to be deposited in a bank, subject to the plaintiff's order, this was not a compliance with the decree.

5. Where both parties introduced evidence, and taken as a whole it required a verdict for the defendants, there was no error in the court's directing such a verdict, instead of directing a nonsuit or dismissal ex mero motu.

6. The judgment complained of in the main bill of exceptions having been affirmed, the cross-bill of exceptions is dismissed.

APRIL 18, 1913.   REHEARING DENIED MAY 16, 1913.

Equitable petition. Before Judge Thomas. Colquitt superior court. April 3, 1912.

Mrs. Uretta Roland filed her equitable petition, seeking to cancel a deed which she made to her husband. A demurrer was filed to the petition on certain grounds. It was overruled. The case was brought to this court by bill of exceptions, assigning error upon the

overruling of the motion and striking certain parts of the answer. The judgment was reversed as to some of the rulings. 131 *Ga.* 579. After the case was returned to the trial court, a settlement was had, and on April 4, 1910, a consent decree was taken covering that case, and also a petition for alimony which had been filed by the wife against the husband. It contained the following provisions: " (1) Geo. W. Roland is to pay to his wife, Uretta Roland, the sum of $1,750.00 seventeen hundred and fifty dollars, on or before Dec. 1, 1910, without interest. (2) G. W. Roland is to have the rents, issues, and profits of said land for the year 1910, pay the taxes on same, and exercise acts of ownership over it. (3) The sum of $1,750.00 is to be in bar of any suit for alimony damages, claims, rents, issues, or profits, and is to be in lieu of all claims whatsoever, in law or equity, which the wife may have against the husband, G. W. Roland, in the future. (4) If the said G. W. Roland pays the said $1,750.00 by December 1st, 1910, then the title to the said lands in question shall vest unconditionally in him; but if he does not pay said sum of $1,750.00 on or by that time, then the title to said lands shall vest in the wife, Uretta Roland, time being of the essence of this decree. (5) Geo. W. Roland shall pay all court costs in these two cases." The consent to this decree was signed by Mrs. Roland and her husband in person and also by their respective attorneys.

On March 13, 1911, J. P. Roland filed his equitable petition against Mrs. Uretta Roland, Benjamin A. Tucker, Zachie Whitfield, Iola B. Morrison, and R. M. Morrison as administrators of the estate of John Morrison, alleging in substance as follows: At the date of the consent decree the land was reasonably worth from $3,500 to $4,000, and it was not contemplated that Geo. W. Roland, the defendant therein, would fail to make the payment of $1,750 to his wife and thus lose the property. George W. Roland was at the date of the decree, and still is, a resident of Florida, and is the brother of the present plaintiff. Shortly after the date of the decree George W. Roland began negotiations with the plaintiff looking to the sale of the lands to the latter and the raising of the amount necessary to make the payment to his wife in compliance with the decree. Finally the present plaintiff bought the land from his brother, paying therefor the sum of $3,000, and, for the purpose of perfecting the title, at the instance of George W.

Roland placed on deposit to the credit of Mrs. Roland in the Citizens Bank of Moultrie the sum of $1,750.00, the whereabouts of Mrs. Roland being unknown to this plaintiff or to G. W. Roland at the time of the deposit, which was October 22, 1910. On that day this plaintiff and G. W. Roland paid to the clerk of the court the costs due under the decree, and G. W. Roland executed to this plaintiff a warranty deed to the land, and the latter, shortly thereafter, went into possession. This plaintiff did not know then or thereafter the place of residence of Mrs. Roland, and he charges that she concealed herself so that actual tender of the money fixed by the decree could not be made to her before the expiration of the date of payment therein named; and he also charges that she knew of the deposit in the bank long before December 1. On December 2, she appeared in Moultrie, and was immediately tendered the money, which she refused. On that day she executed a warranty deed to Tucker for the recited consideration of $2,750. On the same day, Tucker, for the purpose of obtaining money to pay for the lands, executed to the Morrisons, as administrators, a security deed. On the next day Tucker executed to Zachie Whitfield a warranty deed for the recited consideration of $3,000. The plaintiff charges that each of these parties took with notice of his rights and of the facts above stated. On December 5, Mrs. Roland procured from the judge of the superior court an order for a writ of possession, and under it this plaintiff was evicted and Zachie Whitfield entered into possession. The plaintiff has frequently asked Mrs. Roland and her attorneys to take possession of the deposit in the bank and to cause possession of the land to be surrendered to him. The prayers were, for a cancellation of the deeds from Mrs. Roland to Tucker, from Tucker to the Morrisons as administrators, and from Tucker to Zachie Whitfield; for receiver and injunction; for the setting aside of the writ of possession and the order on which it was based, and the restoration of possession to the plaintiff; and for general relief and process.

In her answer, Mrs. Roland denied any knowledge of the transactions between her husband and his brother, or that any money had ever been tendered to her under the consent decree. She also denied having concealed herself, but alleged that she had continuously lived "in and around" the county where the suit was brought, either at the home of her mother or with her brothers and

sisters, having nowhere else to go after her·husband deserted her. She further denied that she knew anything about any deposit in the Citizens Bank for her until after December 1, 1910, but alleged that the officers of the bank informed her, on December 2, that the sum of $1,750 was deposited in the bank for her, provided she would make a deed to the property in question, which she refused to do. She admitted selling and conveying the land to Tucker on December 2, but alleged that the land belonged to her, that the decree had not been complied with, and that she had a perfect right to sell the property.

The other defendants denied any knowledge or notice of any claim on the part of J. P. Roland, the present plaintiff, and alleged that the sale by Mrs. Roland to Tucker on December 2, after the time for payment under the consent decree had elapsed without payment being made, was bona fide and for value, as was also the deed made by him to secure money with which to make the payment, and the sale by him on the next day.

By amendment the plaintiff alleged a tender to the attorneys of record of Mrs. Uretta Roland prior to December 1, 1910, and also a tender to her brother, who was alleged to be her agent, and a refusal of each tender.

As to some minor details there was conflict in the evidence; but taking it as to such matters most strongly in favor of the plaintiff, it showed the following facts: At the time when the settlement was made and the consent decree was taken, Mrs. Roland hesitated about agreeing, and stated that she was not willing for the money to be paid to any one but herself. Both she and her husband and the attorneys representing them agreed to this, and she was informed that unless the money was paid to her by December 1, the land would be hers. There had been some discussion about writing the decree so that payment could be made to her or her attorneys, but, after her statement set out above, the decree was drawn with the provision that Roland should pay the money to his wife. The attorney who represented her in the transaction testified: "That was the absolute agreement. She withdrew my authority, if I ever had any, to receive the money. . . I had no authority from the signing of the decree to accept the money or sell the land in any way. . . She was to take the money in hand, and I run the risk of getting my fee. I could file a lien

on the place. In fact she wouldn't consent to it any other way."
On October 22, George W. Roland, the defendant in the former
proceeding, went to Moultrie to close up a purchase of the land by
his brother from him.  They went to a person who appears to
have been an officer of the bank, and J. P. Roland stated that his,
brother wished to leave on a train which departed in a short time,
and asked the official to assist him in winding up the matter.  The
attention of such official was called to the decree which had been
rendered.  He inquired where Mrs. Roland was, and they told him
they did not know.  He then inquired who were her attorneys,
and was told that they were Messrs. Shipp & Kline.  He said
that, according to his understanding, they could receive the money.
So they, or George W. Roland, asked him to go and pay it to the
attorneys.  He went to the office of the attorneys named, and said
to Mr. Shipp that he supposed the latter represented the case
(naming the case in which the decree had been rendered), and
the attorney said he did.  The bank official stated that there was
a trade made and the money was ready and he wanted to pay the
attorney the amount specified in the decree.  Arrangements had
been made by which the money was ready to be paid.  Mr. Shipp
replied that he was not authorized to receive it, and that no one
was so authorized except Mrs. Roland.  The officer replied that he
was a little surprised, that he thought, in a legal sense, one's at-
torneys were the same as himself and could receive the money.  He
then went back and conferred with the Rolands; and the three
decided that the next nearest thing to paying it to her was to put
it in her name on deposit, and that was agreed upon and done.
There was no evidence of any tender to Mrs. Roland on or before
December 1, nor even to the attorney except as above stated.  Nor
was there any evidence of any inquiry made as to her whereabouts
from the attorneys, nor that she could not have readily been found.
The only evidence tending in that direction was a statement on the
part of J. P. Roland, that "I knew her [during] the months of
November and December, 1910, but did not know where she lived
at that time.  I did make an inquiry to find out."  What inquiry
he made, or from whom, or when, or what difficulty there was in
ascertaining her whereabouts, did not appear.  George W. Roland
left his wife, and she went to live with her mother.  She did not
leave the county, or conceal herself, or do anything else to prevent

payment under the decree. Some time during the fall she heard in a casual way that "they" claimed to have money deposited to her credit in the bank of Moultrie, but no tender was made to her, nor did they ever tell her that they had money in the bank for her. She "just heard it like you would anything in the country." On December 1, she was in Moultrie and spent the day there. She met the attorney who had represented her husband in the litigation, and asked if he was ready for a settlement, but was informed that her husband had left town some days previously, and that the attorney did not know where he had gone. No tender was made to her, and nothing said to her about any money being in bank for her. On the second of December she again went to Moultrie and remained several days, during which time she conveyed the property to Tucker. The attorney who had represented the husband of Mrs. Roland in the previous litigation testified that he had endeavored to assist his client in raising money with which to pay the amount stated in the decree, but that the latter had gone to Florida without paying the attorney his fee, and the attorney did not know where he was, nor did he know anything of any deposit of money in the bank for Mrs. Roland until after December 1. There was some difference among the witnesses as to the amount of this attorney's fee, and as to the statements of the witness in regard to it. There was some evidence tending to show that the officer of the bank was absent from Moultrie just before December 1, and returned late on the evening of that day. There was other evidence which it is unnecessary to state in detail.

At the close of the evidence, on motion, the judge directed a verdict in favor of the defendants, and the plaintiff excepted. The defendants filed a cross-bill of exceptions, assigning error on the overruling of certain demurrers.

*James Humphreys, W. A. Covington,* and *Pope & Bennet,* for plaintiff. *Shipp & Kline,* for defendants.

LUMPKIN, J. (After stating the foregoing facts.)

1. The consent decree required the husband to pay to his wife $1,750 on or before December 1, 1910, in order for the title to vest in him, and provided that if he did not make such payment by that time the title should vest in the wife. Time was expressly declared to be of the essence of the decree. He did not make the payment to his wife within the time specified, nor did he or any

person for him make any tender to her. The evidence entirely failed to show any concealment of herself by the wife. Her husband having left her, she lived with her mother and kindred, but remained in the county from April 4, the date of the decree, until after the first of December. No reason is shown why she could not have been found at any time between those dates. When the consent decree was taken, it was expressly agreed and understood by the parties and their attorneys that the payment must be made to the wife in person. The attorney who had represented her signed the agreement to the decree along with her, and testified that his power to receive the money was revoked, if he ever had any such authority. The only effort shown to pay or tender the money was a conversation between a bank official (with whom arrangements had been made in regard to the money by the husband and his brother as the purchaser from him) and the attorney who had represented the wife in taking the decree. This occurred on October 22, and the attorney expressly informed the officer that he did not have authority to receive the money, nor did any one else except the wife. Thus, after both the husband and his brother, who was purchasing from him, had been notified by the attorney of his lack of authority, no further effort was shown to pay or tender it within the time limited by the decree, except to deposit it in the bank for the wife. Of course this was neither payment nor tender to her. Time being of the essence of the consent decree, equity would not relieve the husband, or one claiming as a purchaser from him, after the rendition of such decree, from making payment within the time limited thereby, unless he were prevented from so doing by fraud, or for other sufficient reason.

2. Unless the conversation between the bank official and the attorney who had represented Mrs. Roland, the wife, in obtaining the consent decree amounted to a tender binding on the wife, there was nothing showing any compliance with the decree on the part of the husband, or anything excusing compliance within the time fixed by it.

At common law an attorney's employment was generally held to end with the entry of judgment for or against his client, unless there was some additional agreement or circumstance continuing the relation or prolonging the authority. This general rule has been much modified. 4 Cyc. 940 (c), 952 (D). As early as 1791,

the Court of Appeals of Virginia held, in Hudson v. Johnson, 1 Wash. (Va.) 10, that, in general, payment to an attorney at law who had prosecuted an action on a specialty was good, "on the custom of the country, particularly if he have possession of the specialty;" though it was added that "under particular circumstances this rule might not apply, as if notice were given that no such power was vested in the attorney." In 2 Greenleaf on Evidence, § 518, the same rule is announced, but it is added that "Proof of payment made to the attorney after his authority has been revoked will not discharge the liability of the party paying." In 3 Am. & Eng. Enc. Law (2d ed.), 365, the rule is thus stated: "It is always an implied power of an attorney to receive payment of a claim intrusted to him for collection; a payment to him, while his authority is unrevoked, is therefore binding on his client unless it affirmatively appears that the party making the payment has actual notice of his want of authority." And on page 367 it is stated that "A revocation of the attorney's authority, after judgment has been rendered but before payment, or an assignment of the judgment, will not affect the debtor paying to the attorney in good faith relying on his authority to receive the payment, unless it appears that the debtor had notice of the revocation or was chargeable with such notice." See also Yoakum v. Tilden, 3 W. Va. 167 (100 Am. D. 738); Ruckman v. Alwood, 44 Ill. 183. In Erwin v. Blake, 8 Peters, 18 (11 Curt. 8, 8 L. ed. 852), Mr. Justice Story said that where an attorney obtained a judgment and execution for his client, and levied on and caused to be sold property, which was bid in by his client, and where the judgment debtor had a right to redeem the property within a particular period of time, by payment of the amount to the judgment creditor, there was strong reason to contend that the attorney was impliedly authorized to receive the amount, and thus indirectly to discharge the lien on the land; at least, if this was the common course of practice in the State where the transaction occurred. But it was said that it was not necessary to rely on that ground. See also Gray v. Wass, 1 Greenl. 257. On the other hand, In re Grundysen, 53 Minn. 346 (55 N. W. 557), it was said that the mere employment of an attorney to foreclose a mortgage does not give him authority to receive from the sheriff money paid after foreclosure, to redeem the property from a sale to the mortgagee.

In this State a recovery of a judgment for money impliedly authorizes the attorney to collect it. Under the statute which gives to an attorney a lien upon suits and judgments (Civil Code, § 3364), a client can not arbitrarily take from an attorney the right to enforce a judgment, without his consent, and so as to destroy his lien for an unpaid fee. But an attorney is not obliged to insist upon his lien or his right to collect the judgment or execution. He may waive it or submit to a discharge. One who pays to the attorney of record the amount of the judgment or execution without notice of any termination of his authority may well be relieved from further liability to the client. But if the attorney and client agree upon a discharge or a termination of his authority, and the judgment debtor is notified thereof, he can not insist upon the right of the attorney to assert his lien or to refuse to have his authority revoked. A case might occur where the question would arise whether such revocation of authority was a mere trick or device to prevent payment within the limited time; but the evidence presents no such situation here. It shows that all parties agreed and understood when the decree was taken that the payment was to be made to the client herself, and not to her attorney, and that his authority (if the decree in question falls within the general rule of the power of an attorney to collect) was revoked. It is not clear that the brother of the defendant in the former proceeding was not fully apprised of the situation throughout; but if not, he was informed of it on October 22, more than a month before the time for payment had elapsed. Under such circumstances, if the conversation between the official of the bank and the attorney who had represented the wife in obtaining the consent decree had amounted to a tender to such attorney, it would not have taken the place of a tender or payment to the wife. Moreover, if it had been desired to insist that it was the right and duty of the attorney to receive the money, in spite of his declaration that he was without authority to do so, and that a tender could be made to him, it would seem that an actual tender to him should have been made, and not a mere deposit of the money in bank.

3. Error was assigned on the admission of evidence to the effect that it was understood and agreed by both the attorneys and clients that payment should be made only to the wife and not to the attorney, and that the latter was not authorized to receive pay-

ment. The ground of objection stated in the bill of exceptions was that this evidence was irrelevant. We think it was relevant. The ground of objection argued was that this was an effort to modify or change a consent decree by parol evidence. This argument rested upon a misconception of the basis of the relevancy of the evidence. The decree did not in terms authorize payment to the attorney of the wife, but to her. It declared that title should be vested in the husband if he should pay a certain sum to the wife on or before a fixed day. If this should be treated as in the nature of a decree for the recovery of money, the attorney's right to collect would not arise from the words of the decree, but from the general or implied authority of an attorney. Such authority could be modified or withdrawn by an agreement to which the parties and attorneys assented. The evidence did not conflict with the decree, but showed a withdrawal or negation of any implied authority on the part of the attorney to proceed further, after its rendition.

4. The purchaser contracted with full knowledge of the decree and subject to its terms. The husband had no power to change those terms by a conveyance to his brother. The brother alleged that he had no notice of want of authority on the part of the attorney to receive the money, and thus sought to excuse a tender to the client. He failed to show this; but, on the contrary, proved that, at least on October 22, he had actual notice that the attorney asserted his want of authority; and that the money was deposited in a bank where it lay until December 2.

When the case between the husband and wife was before this court on the question raised by demurrer, it was remarked by the writer of the opinion that "the difficulty with the petition is that it prays too much and alleges too little." In the present case this statement may well be paraphrased, and it may be said of the plaintiff that his trouble was that he alleged too much and proved too little.

5. Both sides introduced evidence. There was no motion for a nonsuit or for a dismissal. The evidence as a whole required a verdict for the defendant, and it was not error for the presiding judge to so affirmatively instruct the jury, instead of granting a nonsuit ex mero motu.

6. The judgment complained of in the main bill of exceptions having been affirmed, the cross-bill .of exceptions is dismissed.

*Judgment affirmed on the main bill of exceptions. Cross-bill of exceptions dismissed. All the Justices concur.*